1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10    VOLTSTAR TECHNOLOGIES, INC.,        Case No. 2:19-cv-07355-MCS-(Ex)

11          Plaintiff,                    **ORDER GRANTING-IN-PART AND
12                                        DENYING-IN-PART DEFENDANTS'
                                          MOTION FOR PARTIAL SUMMARY
13          v.                            JUDGMENT OF NON-
14                                        INFRINGEMENT OF U.S. PATENT
      SUPERIOR      COMMUNICATIONS,       NO. 7,960,648  [144] AND
15    INC. et al.,                        GRANTING-IN-PART AND
16                                        DENYING-IN-PART DEFENDANTS'
            Defendants.                   MOTION TO EXCLUDE EXPERT
17                                        TESTIMONY [122]**
18

19          In this action, Voltstar Technologies, Inc. ("Voltstar") alleges that Superior

20    Communications, Inc. ("Superior") and AT&T Mobility LLC ("AT&T") (collectively,

21    "Defendants") have infringed U.S. Patent Nos. 7,910,834 ("the '834 Patent") and

22    7,960,648 ("the '648 Patent") (collectively, "the Patents-in-Suit") for distributing the

23    Superior Qi wireless charging pads (the "Accused Devices"). Complaint (ECF No. 1).

24    Defendants move for partial summary judgment of non-infringement as to Claims 31,

25    32, 39, and 40 (the "Asserted Claims") of the '648 Patent. ("PMSJ," ECF No. 144.)

26    Along with the motion for partial summary judgment, Defendants filed a Statement of

27    Uncontroverted Facts and Conclusions of Law, four declarations, and multiple exhibits.

28

1    ("SUF," ECF No. 144-23; "Flior Decl.," ECF No. 144-8; "Chen Supp. Decl.," ECF No.

2    144-12; "Horenstein Supp. Decl.," ECF No. 144-13; "Leach Decl.," ECF No. 144-22;

3    "Defs.' Exs.," ECF Nos. 144-3 – 144-7, 144-9 – 144-11, 144-14 – 144-21.)

4         Voltstar filed an Opposition, six declarations, multiple exhibits, and responses to

5    Defendants' SUF. ("PMSJ Opp'n," ECF No. 143; "Tobias Decl.," ECF No. 143-3;

6    "Tobias Supp. Decl.," ECF No. 143-4; "McGinley Decl.," ECF No. 143-17; "McGinley

7    Supp. Decl.," ECF No. 143-18; "Dunne Decl.," ECF No. 13-29; "Dunne Supp. Decl.,"

8    ECF No. 143-30; "Pl.'s Resp. to Defs.' SUF," ECF Nos. 143-1; "Pl.'s Exs.," ECF Nos.

9    143-6 – 143-16, 143-19, 143-20, 143-21, 136 (sealed version), 143-22  – 143-28, 143-

10   31 – 143-34.)

11        Defendants then filed a Reply and evidentiary objections. ("PMSJ Reply," ECF

12   No. 138; "Defs.' Evid. Obj.," ECF No. 139-1.)[1]

13        Defendants also move to exclude certain expert testimony by Voltstar's expert

14   Dr. John M. Tobias. ("*Daubert* Mot.," ECF No. 122.) Voltstar filed an Opposition.

15   ("*Daubert* Opp'n," ECF No. 129.) Defendants then filed a Reply. ("*Daubert* Reply,"

16   ECF No. 137.)

17        The Court deems this matter appropriate for decision without oral argument. *See*

18   Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. For the following reasons, Defendants' motion

19   for partial summary judgement is **GRANTED-IN-PART** and **DENIED-IN-PART**,

20   and Defendants' motion to exclude is **GRANTED-IN-PART** and **DENIED-IN-**

21   **PART**.[2]

22

23

24   [1]    Defendants raise a number of evidentiary objections.  The Court rules on only
     those objections that are material to its ruling.  Where the Court does not rely on certain
25   challenged evidence, no ruling is necessary as to admissibility. To the extent the Court
     relies on an exhibit and does not make an express ruling on Defendants' objections,
26   those objections are overruled.
     [2]    Exhibit 18 filed in support of Voltstar's Opposition was filed under seal. Within
27   seven days of the issuance of this Order, the parties shall file a joint statement as to
     whether any matter stated in this Order is information that one or more contend should
28   remain under seal. Thereafter, a determination will be made as to whether any portions

1    **I.    BACKGROUND**

2         The '648 Patent, entitled "Energy Saving Cable Assemblies," issued on June 14,

3    2011. It discloses "[a] cable assembly for use with any power cable for an electrical

4    device, the cable assembly including a remotely locatable switch for connecting or

5    disconnecting the electrical device from power draw." '648 Patent at Abstract. The '648

6    Patent relates to "cable assemblies for use with electrical devices having on-board

7    rechargeable batteries"; the invention sought to "substantially reduc[e] or eliminat[e]"

8    "power drain commonly known as 'phantom' load." '648 Patent at 1:18-19, 1:24-26.

9    Figure 1 provides an illustration of an embodiment of the claimed cable assembly.

10

11

12                                   

13

14

15

16

17

18

19

20

21   '648 Patent, Fig. 1.

22         The '648 Patent discloses fifty-two claims, including six independent claims.

23   Dependent Claim 31, which depends from Claim 26, and dependent Claim 39, which

24   depends from Claim 34, are relevant to the parties' claim construction disputes.

25         Claim 26 recites:

26   _____

27
     of this Order should be redacted in the version filed on the public docket, with a
28   corresponding, non redacted version filed under seal.

3

26. In combination with an electrical device, a cable assembly for connecting and disconnecting electrical power to the electrical device, the system comprising:

an input portion for connection with a power source for receiving input electrical power;

a converter portion including converter circuitry for converting electrical power; and

switch circuitry for controlling an on and an off state for the system, wherein the switch circuitry automatically disconnects the input electrical power to switch the system to the off state in response to a reduced power state of the electrical device, **wherein the cable assembly consumes substantially no power while in the off state**.

'648 Patent, Claim 26 (emphasis added).

Dependent Claim 31 discloses the device in Claim 26 where that device includes "pulse monitoring circuitry operable to monitor pulses and drive the switch circuitry based thereon." *Id*., Claim 31. Dependent Claim 32 depends from Claim 31 and recites, "The cable assembly as recited in claim 31 further comprising a transformer, wherein the pulse monitoring circuitry is operable to monitor pulses from the transformer and drive the internal switching circuitry based thereon." *Id*., Claim 32.

Claim 34 recites:

34. In combination with an electrical device, a cable assembly for connecting and disconnecting electrical power to the electrical device, the system comprising:

an input portion for connection with power source for receiving input electrical power;

a converter portion including converter circuitry for converting electrical power; and

switch circuitry for controlling an on and an off state for the system, wherein the switch circuitry automatically connects the input electrical power to switch the system to the on state, **wherein the cable assembly consumes substantially no power while in the off state**.

'648 Patent at Claim 34 (emphasis added).

Dependent Claim 39 discloses the device in Claim 34 where that device includes "pulse monitoring circuitry operable to monitor pulses and drive the switch circuitry based thereon." '648 Patent at Claim 39. Dependent Claim 40 depends from Claim 39 and recites, "The cable assembly as recited in claim 39 further comprising a

4

1  transformer, wherein the pulse monitoring circuitry is operable to monitor pulses from

2  the transformer and drive the internal switching circuitry based thereon." *Id*., Claim 40.

3  ## II.    LEGAL STANDARDS

4  ### A.    Summary Judgment

5   Summary judgment is appropriate where there is no genuine issue of material

6  fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

7  P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A fact is material when,

8  under the governing law, the resolution of that fact might affect the outcome of the case.

9  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the

10 evidence is such that a reasonable jury could return a verdict for the nonmoving party."

11 *Id.* The burden of establishing the absence of a genuine issue of material fact lies with

12 the moving party, *see Celotex*, 477 U.S. at 322–23, and the court must view the facts

13 and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott*

14 *v. Harris*, 550 U.S. 372, 378 (2007).

15  To meet its burden, "[t]he moving party may produce evidence negating an

16 essential element of the nonmoving party's case, or, after suitable discovery, the moving

17 party may show that the nonmoving party does not have enough evidence of an essential

18 element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan*

19 *Fire & Marine Ins. Co. v. Fritz Cos*., 210 F.3d 1099, 1106 (9th Cir. 2000). Once the

20 moving party satisfies its burden, the nonmoving party cannot simply rest on the

21 pleadings or argue that any disagreement or "metaphysical doubt" about a material issue

22 of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio*

23 *Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record

24 taken as a whole could not lead a rational trier of fact to find for the nonmoving party.

25 *Id*. at 587.

26 ### B.    Direct Infringement

27  Determining patent infringement is a two-step process.  *Markman v. Westview*

28 *Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  The first step is to construe the

claims; *i.e.*, to determine the scope and meaning of what is allegedly infringed. *Id.* This step is a question of law. *Id.* at 970-71. The second step is to compare the properly construed claims to the accused product to determine whether each of the claim limitations is met, either literally or under the doctrine of equivalents. *Id.* at 976; *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed. Cir. 2002); *Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1173 (Fed. Cir. 1993) (although no literal infringement of a claim, an accused device may still infringe under the doctrine of equivalents.). This determination is a question of fact. *Bai v. L &L Wings Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998); *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001).

Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). The absence of one claim element establishes non-infringement and makes immaterial whether there are issues of fact as to the absence or presence of other claim limitations. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). If the moving party meets this initial requirement, the burden shifts to the party asserting infringement to set forth, by declaration or as otherwise permitted under Fed. R. Civ. P. 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

## C.    Expert Testimony

Rule 702 governs the admissibility of expert testimony. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. Testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods." *Id*. Further, the expert witness

must have "applied the principles and methods reliably to the facts of the case." *Id*. The Supreme Court has imposed a "gatekeeping responsibility" for courts to engage in objective screening to ensure that evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999) (clarifying the "gatekeeping" obligation "applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge").

In *Daubert*, the Supreme Court outlined factors relevant to the reliability prong, including: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. 509 U.S. at 593–94. The Supreme Court emphasized the "flexible" nature of this inquiry. *Id*. at 594; *see also Kumho*, 526 U.S. at 141-42 ("*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather the law grants a district court the same broad latitude when it decides how to determine reliability as [the court] enjoys in respect to its ultimate reliability determination.") Indeed, a "trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho*, 526 U.S. at 152).

## III.    DISCUSSION

### A.    Defendants' Motion for Partial Summary Judgment of Non-Infringement of U.S. Patent No. 7,960,648

Defendants argue that Voltstar has failed to put forth admissible evidence to support a finding that the Accused Devices meet four limitations of the Asserted Claims. *First*, Defendants assert that the Accused Devices do not have the claimed "pulse monitoring circuitry operable to monitor the frequency of pulses and drive the switch

circuitry based thereon" because they only monitor the amplitude. (PMSJ at 11–13.)[3] *Second*, Defendants assert that the primary coil of the Accused Devices is not a "transformer" as construed by the Court. (*Id*. at 9–11.) *Third*, Defendants assert that the Accused Devices do not have the required "switching circuitry" that "must be located before the transformer" as this Court required in its construction for the term "switching circuitry." (*Id*. at 7–9.) *Fourth*, Defendants assert that there is no evidence that the Accused Devices meet the claim limitation "wherein the cable assembly consumes substantially no power while in the off state," and relatedly, that the Accused Devices have any circuitry to eliminate "phantom load." (*Id*. at 18–21.) The Court considers each argument below.[4]

        1.  Whether the Accused Devices Include the Claimed "Pulse Monitoring Circuitry Operable to Monitor the Frequency of Pulses and Drive the Switch Circuitry Based Thereon"

Defendants argue that the Accused Devices do not have "pulse monitoring circuitry operable to monitor the frequency of pulses and drive the switch circuitry based thereon" because the accused "pulse monitoring circuitry" only monitors the amplitude of the pulses. (*See id*. at 12–13.) According to Defendants, "Voltstar has relied ***solely*** upon Version 1.2.3 of the Qi specification document as the basis for alleged infringement." (*Id*. at 12 (emphasis in original).) Defendants argue that assuming this document accurately describes the operation of the Accused Devices, the Accused Devices cannot infringe because the document shows that the "wireless chargers monitor the ***amplitude*** of the relevant signal used in the communications channel, and

---

[3]    Defendants also argue that Voltstar cannot show that the Accused Devices meet this limitation under the doctrine of equivalents (*see* PMSJ at 13–18), but as Voltstar explains in its Opposition, Voltstar does not argue that the Accused Devices meet this limitation under the doctrine of equivalents (*see* PMSJ Opp'n at 11).

[4]    In their reply brief, Defendants argue that "Voltstar should be precluded from relying upon new infringement contentions," specifically referencing ECF Nos. 143-19 and 143-20. (PMSJ Reply at 9–10.) Given that the Court need not decide this issue to rule on Defendants motion, the Court declines to do so at this time.

not the frequency." (*Id*. at 12–13 (citing "Qi Specification," ECF No. 110-5 at 86 ("the Power Receiver and Power Transmitter use an amplitude modulated Power Signal to provide a Power Receiver to Power Transmitter communications channel")).) Defendants also argue that the Qi Specification does not accurately describe how the Accused Devices operate, as the "Accused Devices only monitor the ***amplitude*** of the pulses, not the frequency of the pulses." (*Id*. at 13 (emphasis in original) (citing Chen Supp. Decl. ¶¶ 15–24).)

Voltstar responds that the Qi Specification shows that the "control circuitry" of the Accused Devices "monitors the frequency of the modulated [switch pattern pulses in the power signal], to convert the pulses to digital information, which in turn drives the switch circuitry of the [Accused Devices]." (PMSJ Opp'n at 12–13 (citing Tobias Decl. ¶¶ 50–55; Qi Specification, Section 5.2.1, Section 5.2.2.2, Fig. 36 at 86, 87).[5]) Thus, according to Voltstar, the Accused Devices first modulate the amplitude of the pulses of the power signal, i.e., the "modulation scheme" step, then monitor the frequency of the pulses, i.e., the "bit encoding scheme" step. (*See id*.) Voltstar asserts that the "bit encoding scheme" "correspond[s] to the frequency of the digital pulses" and "convey[s] meaningful information that is interpreted by the charger's pulse monitoring circuitry for control, which includes entering an on and off state." (*Id*. at 12.)

Voltstar also argues that although some aspects of the Qi Specification are optional, the "bit encoding scheme" section states that "Qi Complaint devices '***shall*** use' the bit encoding scheme described therein." (*Id*. at 13 (emphasis in original) (citing Qi Specification, Section 5.2.2. at 86–88).) According to Voltstar, George Chen, Vice President of Product Development for Superior, testified that "he did not know how data was encoded on the power signal of the Accused Devices." (*Id*. (citing "Chen Depo. Tr.," ECF No. 143-34 at 50:4–51:25).) Finally, Voltstar argues that "the technical

---

[5] The same Qi Specification document is filed at ECF Nos. 110-5 and 143-25.

documents for the [Accused Devices] confirm that the [Accused Devices] comply with [the Qi Specification] in all relevant parts." (*Id*. at 12 n.9 (citing McGinley Decl. ¶¶5–34; ECF Nos. 143-19 – 143-26; "Horenstein Depo. Tr.," ECF No. 143-33 at 89:11–91:19, 124:1–15, 133:2–25).)

Defendants reply that the Accused Devices do not use the "bit encoding scheme" described in the Qi Specification. (*See* PMSJ Reply at 8 (citing Chen Supp. Decl. ¶¶ 19–21).) Defendants assert that Chen never testified that "he did not know how data was encoded on the power signal of the Accused Devices" as Voltstar asserts, but instead testified that he did know what the author of the Qi Specification was referring to in the "bit encoding scheme" section of the Qi Specification. (*Id*. at 8–9 (citing Chen Depo. Tr. 50:4–51:25).) Defendants also argue, "The bit encoding scheme shown in Figure 36 on page 88 of [the Qi Specification] is only labeled as an 'example' of a bit encoding scheme that *can* be used." (*Id*. at 9 (emphasis in original) (citing Qi Specification, Fig. 36 at 88).) According to Defendants, the Accused Devices did not actually use this optional feature. (*Id*.)

There is a genuine dispute of material fact whether the Accused Devices use the "bit encoding scheme" described in the Qi Specification. In their motion, Defendants do not contest that the "bit encoding scheme" meets the limitation "pulse monitoring circuitry operable to monitor the frequency of pulses and drive the switch circuitry based thereon." Thus, the parties only dispute whether the Accused Devices use the "bit encoding scheme." Based on the evidence presented by Voltstar, a reasonable juror could find that the Accused Devices use the "bit encoding scheme." For instance, the Qi Specification states that the "Power Receiver shall use" the "bit encoding scheme." (Qi Specification at 87; *see also id*. at 10 ("For clarity, the word "**shall**" indicates a requirement that is to be followed strictly in order to conform to the [Qi Specification], and from which no deviation is permitted.") (emphasis in original).) Further, Figure 36 depicts an "example" of how the "bit encoding scheme" operates, which does not mean that the "bit encoding scheme" is itself optional as Defendants argue. (*Id*., Fig. 36 at

88.) Further, Chen's supplemental declaration does not conclusively show that the Accused Devices do not use the "bit encoding scheme." (Chen Supp. Decl. ¶ 20 (testifying, without explanation or citation, "If [Voltstar] had tested the Accused Devices, Voltstar would know that the Accused Devices do not use that bit encoding scheme. I testified about this during my deposition on August 25, 2021").)

Accordingly, the Court **DENIES** Defendants' motion with regard to the "pulse monitoring circuitry operable to monitor the frequency of pulses and drive the switch circuitry based thereon" limitation.

2.  <u>Whether the Accused Devices Have a "Transformer"</u>

Defendants argue that the Accused Devices do not have a "transformer" as construed by the Court and required by Claims 32 and 40. The Court construed the term "transformer" to mean "a static electrical component consisting of a combination of two or more coils of wire positioned adjacent to one another where the magnetic field of a first coil is inductively linked to a second coil by magnetic lines of force that allow the transmission of electrical energy from one coil to the other through magnetic induction, with or without a magnetic core." ("*Markman* Order," ECF No. 87 at 37.) Defendants assert that the Accused Devices only have one primary coil and no static secondary coil, and therefore cannot infringe the "transformer" limitation. (*See* PMSJ at 9–11 (citing Chen Supp. Decl. ¶¶ 12–14).) Defendants argue that Voltstar's infringement theory rests on a misinterpretation of the Court's construction of the term "transformer," and Voltstar cannot now relitigate that construction. (*See id.*)

Voltstar responds that the primary coil still acts as a "static transformer" when coupled with the secondary coil in the device that is charged using the Accused Devices. (PMSJ Opp'n at 16–17 (citing Tobias Decl. ¶¶ 22–28; ECF Nos. 143-16, 143-19, 143-20).) According to Voltstar, the Court never construed the term "static" in the construction of the term "transformer," and the terms "'static' and 'dynamic' do not refer to whether an element of the device can be moved while not in use," but instead "refer to the motion (or lack of motion) required for the generation or conversion of

electrical energy." (*Id*. at 17 (citing Tobias Decl. ¶¶ 23–27; ECF Nos. 143-11, 143-12).) Voltstar also argues that even if the Accused Devices do not literally meet the claimed "transformer" limitation, there is a genuine dispute of material fact whether the Accused Devices meet the limitation under the doctrine of equivalents when the primary coil is coupled to the secondary coil in the charging device. (*Id*. at 23 (citing *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1345–47 (Fed. Cir. 2013); Tobias Decl. ¶ 56).)

Defendants reply that contrary to Voltstar's assertion, "[t]he Court rejected Voltstar's contention that a 'transformer' included two magnetically coupled coils that may be separated," as evidenced by the Court's inclusion of the word "static." (PMSJ Reply at 5.)

The Court finds that there is no genuine dispute of material fact that the Accused Devices do not literally meet the claimed "transformer" limitation. The Court included the word "static," as proposed by Voltstar in its own construction, in response to Voltstar's argument that the "transformer" "only requires two windings when transferring electrical power." (*See Markman* Order at 31–33.) The Court rejects Voltstar's belated attempt to relitigate this issue by manufacturing new arguments and evidence about the term "static." Given that it is uncontested that the Accused Devices only include one coil, there is no dispute that they do not literally meet the claimed "transformer" limitation.

The Court finds that there is a genuine dispute of material fact whether the Accused Devices meet the claimed "transformer" limitation under the doctrine of equivalents, however. A reasonable juror could find that coupling the primary coil in the wireless pad of the Accused Device with the secondary coil in the charging device is equivalent to the claimed "transformer" given Dr. Tobias's testimony. (*See* Tobias Decl. ¶ 56.) Defendants do not contest this in their briefing.

Accordingly, the Court **GRANTS** Defendants' motion that the Accused Devices do not literally meet the claimed "transformer" limitation and **DENIES** Defendants'

motion that the Accused Devices do not meet the claimed "transformer" limitation under the doctrine of equivalents.

> 3. Whether the Accused Devices Have "Switching Circuitry" "Located Before the Transformer"

Defendants argue that the Accused Devices do not have "switching circuitry" "located before the transformer" as construed by the Court. The Court construed the term "switching circuitry" to mean "one or more switches prior to the transformer to initiate and interrupt power draw from the power source." (*Markman* Order at 24.) According to Defendants, the "relevant transformer for purposes of the Court's claim construction order" is the "transformer located in the wall charger that is plugged into an AC wall socket." (PMSJ at 8 (citing Chen Supp. Decl. ¶¶ 7–11).) Defendants argue that because James McGinley, President of Voltstar and named inventor on the '648 Patent, testified that there is no evidence that the Accused Devices have the claimed switching circuitry located prior to the transformer in the wall charger, Voltstar cannot show that the Accused Devices literally infringe. (*See id*. at 8–9 (citing "McGinley Depo. Tr.," ECF No. 144-17 at 79–80).)

Voltstar responds that there is no dispute that the accused "switching circuitry" is located before the accused "transformer." (PMSJ Opp'n at 15 (citing Tobias Decl. ¶¶ 14–20; McGinley Decl. ¶¶ 21, 27; ECF Nos. 143-20, 143-22 – 143-24).) Voltstar argues that Defendants "improperly attempt[] to force the inquiry to the wall adaptor circuitry, ignoring that Voltstar bases its infringement analysis on an entirely different power supply of the Accused Product, the wireless charging pad." (*Id*. at 16.)

Defendants reply that the accused "transformer" cannot be the relevant "transformer" because, "for the purposes of the Court's claim construction, the claimed switching circuit must be located prior to the transformer in the Accused Device that is coupled to the AC input power, and which is most directly responsible for power draw or phantom load." (PMSJ Reply at 4.)

The Court finds that there is a genuine dispute of material fact whether the

Accused Devices have the requisite "switching circuitry." Although the Court finds that the accused "transformer" does not literally meet the "transformer" limitation as stated above, there is no dispute that the accused "switching circuitry" is located before the accused equivalent "transformer." Defendants' argument that the accused equivalent "transformer" is not the relevant "transformer" effectively seeks to reargue that the "switching circuitry" must be "before (i.e., upstream of) any of the power consuming components," which the Court already rejected in the *Markman* Order. (*See Markman* Order at 23–24.) Defendants never requested and the Court never imposed a requirement that the claimed "transformer" be "coupled to the AC input power," and the Court declines to do so now.

Accordingly, the Court **DENIES** Defendants' motion that the Accused Devices do not literally meet the claimed "switching circuitry" limitation.

4. Whether the Accused Devices Have a "Cable Assembly [That] Consumes Substantially No Power While in the Off State" or Circuitry to Eliminate "Phantom Load"

Defendants argue that the Accused Devices do not have a "cable assembly [that] consumes substantially no power while in the off state" as required by the Asserted Claims. Specifically, Defendants argue that "[d]uring the reexamination proceedings, the Patent and Trademark Office construed this claim limitation to require that while in the off state, the 'power consumption level that is *less than what would be achieved if the power saving feature were not present*." (PMSJ at 18 (emphasis in original) (citing 143-16, Ex. A at 19).) According to Defendants, McGinley admitted that this construction is correct. (*Id*. at 18–19 (citing McGinley Depo. Tr. at 95–100, 104, 105).) Defendants also argue that McGinley "admitted it is not sufficient to merely show that substantially more power is drawn during charging as compared to less power being drawn under no load[.]" (*Id*. at 19 (citing McGinley Depo. Tr. at 104, 105).) Additionally, Defendants argue that it is undisputed that the Accused Devices do not have circuitry to eliminate "phantom load" to achieve the claimed "off state" because

14

"[t]he design of the [Accused Devices] is intended to always draw a small amount of standby current, or 'phantom load,' from input electrical power and/or the input power source when no electrical device (such as a smart phone) is on the wireless charging pad." (*Id*. at 20–21 (citing Chen Supp. Decl. ¶¶ 26, 27).) Thus, Defendants argue that Voltstar "does not have any admissible evidence to show that the Accused Devices meet the claim limitation: 'wherein the cable assembly consumes substantially no power while in the off state.'" (*Id*. at 19.)

Voltstar responds that the Court already rejected Defendants' argument that the circuitry needs to "eliminate" the "phantom load" such that no power is drawn while in the "off state." (PMSJ Opp'n at 19–20 (citing *Markman* Order at 23).) According to Voltstar, the evidence shows that the Accused Devices enter into a "sleep mode" when the Accused Devices are not charging a mobile device, which only drew 180 mW in one Accused Device, eliminating "98.14% of the power draw when compared to the on-state." (*See id*. at 20–22 (citing Tobias Decl. ¶¶ 44–49; McGinley Decl. ¶¶ 21, 27; Qi Specification, Section 9; ECF No. 143-20, Section 7.1; ECF Nos. 143-22 – 143-24, Section 8).) Thus, Voltstar argues that there is at least a genuine dispute of fact whether the Accused Devices literally meet the limitation "wherein the cable assembly consumes substantially no power while in the off state." (*Id*.)

Defendants reply that Voltstar's Opposition only addresses "whether power draw has to be completely eliminated" in an "off state," and not whether the Accused Devices meet the limitation "wherein the cable assembly consumes substantially no power while in the off state." (PMSJ Reply at 6.) Specifically, Defendants argue that Voltstar has only shown that "one of the Accused Devices draws less power when not charging than it draws when charging, which is insufficient." (*Id*. at 7.) Defendants assert that prior art devices that did not utilize the claimed "power saving feature of the '648 Patent" drew less power in a no-load state than the Accused Devices, highlighting why Voltstar's evidence is insufficient to show infringement. (*Id*. (citing McGinley Depo. Tr. at 36–39, 55–59; ECF No. 144-18; ECF No. 144-19 at 2; ECF No. 144-21 at 4).)

The Court finds that there is a genuine dispute of material fact whether the Accused Devices consumes "substantially no power while in the off state." As a preliminary matter, Defendants' arguments for the terms "off state" and "wherein the cable assembly consumes substantially no power while in the off state" are effectively the same, i.e., whether power consumption is sufficiently reduced during the claimed "off state." Voltstar introduced evidence that one of the Accused Devices draws 180 mW in the accused "off state" compared to the approximately 6,261 mW it draws in the "on state." (*See* Tobias Decl. ¶¶ 44–49.) A reasonable juror could find that the 180 mW drawn during the "sleep mode" state of one of the Accused Devices qualifies as "substantially no power" compared to a "no-load" power draw without the "sleep mode" state. Defendants introduce evidence that prior art devices without the power saving feature of the '648 Patent consumed less power in a "no-load" state than the Accused Devices, but a reasonable juror could find that these prior art devices also consume "substantially no power while in the off state."

Accordingly, the Court **DENIES** Defendants' motion as to whether the Accused Devices meet the limitation "wherein the cable assembly consumes substantially no power while in the off state."

## B.    Defendants' Motion To Exclude Expert Testimony

Defendants move to exclude four of Dr. Tobias's opinions. *First*, Defendants argue that the Court should exclude Dr. Tobias's infringement opinions regarding the term "transformer" because it conflicts with the Court's *Markman* Order requiring a static electrical device, as well as any new extrinsic evidence to support his opinion. (*Daubert* Mot. at 5–10, 17–18.) *Second*, Defendants argue that the Court should exclude Dr. Tobias's infringement opinions regarding the term "switching circuitry" because it conflicts with the Court's *Markman* Order requiring the "switching circuitry" to be "located before the transformer." (*Id*. at 11–13.) *Third*, Defendants argue that the Court should exclude Dr. Tobias's infringement opinions regarding the limitation "pulse monitoring circuitry" because  instead of comparing the claims to the operation of the

Accused Devices, he assumed the Accused Devices used the "bit encoding scheme" described in the Qi Specification. (*Id*. at 13–17.) *Fourth*, Defendants argue that the Court should exclude Dr. Tobias's infringement opinions regarding the limitation "wherein the cable assembly consumes substantially no power while in the off state," because he measured the power draw at the wrong point on the Accused Device and did not compare the power draw of the "off state" with the "no-load" power draw of the Accused Device without the accused "off state." (*Id*. at 18–23.) The Court considers each argument below.[6]

### 1. Dr. Tobias's "Transformer" Infringement Opinions and Evidence

Defendants move for the Court to exclude Dr. Tobias's literal infringement opinions and related evidence regarding whether the Accused Devices have the claimed "transformer" because it conflicts with the Court's construction of the term. (*Id*. at 5–10, 17–18.) As stated above regarding Defendants' partial summary judgement motion, the Court rejects Voltstar's attempt to relitigate the construction of the term "transformer." Accordingly, the Court **GRANTS** Defendants' motion to exclude Dr. Tobias's literal infringement analysis opinions for the term "transformer" as well as the new extrinsic evidence used to support his literal infringement analysis (ECF Nos. 110-7, 110-8).

### 2. Dr. Tobias's "Switching Circuitry" Infringement Opinions

Defendants move for the Court to exclude Dr. Tobias's opinions regarding whether the Accused Devices have the claimed "switching circuitry" because the "transformer" he identifies is not the relevant "transformer" and thus, his opinion conflicts with the Court's construction of the term "switching circuitry." (*Id*. at 11–13.) As stated above regarding Defendants' partial summary judgement motion, the Court rejects Defendants' attempt to relitigate the construction of the term "switching

---

[6]    Defendants argue in their opening brief that the Court should exclude Dr. Tobias's opinions distinguishing the prior art on the basis that the references "use a separate data path for communication with the claimed 'pulse monitoring circuitry.'" (*Daubert* Mot. at 23–25.) Defendants appear to have dropped this argument in their reply brief, however. Thus, the Court declines to consider this argument.

circuitry." Accordingly, the Court **DENIES** Defendants' motion to exclude Dr. Tobias's "switching circuitry" opinions.

### 3. Dr. Tobias's "Pulse Monitoring Circuitry" Infringement Opinions

Defendants move for the Court to strike Dr. Tobias's infringement opinions for the limitation "pulse monitoring circuitry" because he assumed for the purposes of his analysis that the Accused Devices used the "bit encoding scheme" described in the Qi Specification. (*Id*. at 13–17.) As stated above regarding Defendants' partial summary judgement motion, there is a genuine dispute of material fact whether the Accused Devices use the "bit encoding scheme." For the purposes of his analysis, there is nothing improper with Dr. Tobias assuming that the Accused Devices used the described "bit encoding scheme," as Voltstar still bears the burden of proving that the Accused Devices actually use the "bit encoding scheme." Defendants' arguments go to the weight of the evidence, not the admissibility. Defendants also argue that Dr. Tobias's opinions are unreliable because he only relies on one schematic for the twelve different Accused Devices and two different versions of the Qi Specification, but Defendants do not identify any relevant difference in any of the products or the two versions of the Qi Specification. (*See Daubert* Mot. at 15–16.) Again, there is nothing inherently wrong with Dr. Tobias's analysis that would warrant exclusion, and Defendants' concerns go to the weight of the testimony, not the admissibility.

Accordingly, the Court **DENIES** Defendants' motion to exclude Dr. Tobias's "pulse monitoring circuitry" opinions.[7]

---

[7]     Defendants also argue that Dr. Tobias's opinions regarding the term "pulse monitoring circuit" should be excluded because it "expands the scope of the claims to just 'monitoring the pulses,'" thus violating the doctrine of prosecution history estoppel. (*Daubert* Mot. at 18–20.) Defendants appear to have dropped this argument in their reply brief, however. Given that Defendants do not contest that the "bit encoding scheme" meets the "pulse monitoring circuit" limitation in their motion of partial summary judgment, the Court denies this portion of Defendants' motion to exclude as well.

4.  <u>Dr. Tobias's "Wherein the Cable Assembly Consumes Substantially No
Power While in the Off State" Infringement Opinions</u>

Defendants argue that the Court should exclude Dr. Tobias's opinions regarding the limitation "wherein the cable assembly consumes substantially no power while in the off state" for two reasons. *First*, Defendants argue that Dr. Tobias did not compare the power draw during the accused "off state" with the "no-load" power draw of the Accused Device without the accused "off state." (*Daubert* Mot. at 21–23.) *Second*, Defendants argue that Dr. Tobias did not measure at the power draw at the "AC wall outlet" as McGinley alleged conceded needed to be done. (*Id*. at 23 (citing Tobias Decl. ¶¶ 45–49; McGinley Depo. Tr. at 45–46, 85).)

The Court finds that neither concern warrants exclusion. As discussed above regarding Defendants' motion for partial summary judgment, Dr. Tobias relies on the Qi Specification, which discloses that  the "sleep" or "stand-by" mode "reduce[s] the power consumption of a wireless power transfer system when power transfer is not required," such as "when the Power Transmitter does not detect the presence of a valid Power Receiver." (Qi Specification at 123.) Further, the Qi Specification recommends that "the Base Station's power consumption in stand-by mode of operation meets the Energy Star EPS Requirements for 'Energy consumption for No-Load' and the European Commission, Code of Conduct of Energy Efficiency of External Power Supplies for 'No-load power consumption.'" (*Id*.) Combined with Dr. Tobias's independent measurement of the "standby mode" power draw, the Court cannot say that Dr. Tobias's opinion or methodology was unreliable. Defendants arguments regarding the "no load" power draw measurements of the prior art devices go to the weight of Dr. Tobias's opinions, not the admissibility.

Additionally, Defendants have not shown that measuring the power draw at a point other than the AC wall outlet renders Dr. Tobias's measurements so unreliable to

warrant exclusion. The Court already rejected Defendants' argument that the "switching circuit" needs to be before any of the power consuming components and rejects Defendants' new argument that the "switching circuitry" needs to be before the "relevant" transformer as opposed to the accused transformer, as stated above regarding Defendants' motion for partial summary judgment. (*See Markman* Order at 23–24.) Given that Dr. Tobias measured the power draw on the primary coil side of the accused transformer, his methodology was not unreliable. Further, as Volstar states, "any reduced power draw of at the wireless charger input would necessarily translate to reduced power at AC wall outlet." (*Daubert* Opp'n at 13.)

Accordingly, the Court **DENIES** Defendants' motion to exclude Dr. Tobias's "wherein the cable assembly consumes substantially no power while in the off state" opinions.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for partial summary judgement is **GRANTED-IN-PART** and **DENIED-IN-PART**, and Defendants' motion to exclude is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**IT IS SO ORDERED.**

Dated: November 2, 2021

_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE